# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARPER CONSTRUCTION COMPANY, INC.; HARPER MECHANICAL CONTRACTORS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, <br><br> Defendant. <br><br> And Related Counterclaim | Case No. 18-cv-00471-BAS-NLS <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **[ECF No. 16]** |

Plaintiff Harper Construction Company, Inc. built a $35 million training facility for the U.S. Army's Patriot Missile System. Less than two years later, the Government informed Harper of cracked walls and binding doors at the facility. The Government demanded that Harper Construction investigate and repair the facility's defects, and the company has incurred nearly $2 million in costs to do so.

Defendant National Union Fire Insurance Company of Pittsburgh, PA, issued a commercial general liability insurance policy to Harper Construction. National Union's insurance policy names the other Plaintiff in this action, Harper Mechanical

Contractors, LLC, as an additional insured. This insurance coverage dispute turns on whether National Union has a duty to defend and indemnify Plaintiffs in connection with the defects at the military training facility.

Presently before the Court is National Union's motion for partial summary judgment. (ECF No. 16.) National Union argues its insurance policy does not establish a duty to defend or indemnify Plaintiffs in these circumstances. The Court heard oral argument on the motion. (ECF No. 29.) For the following reasons, the Court **GRANTS** National Union's motion.

## BACKGROUND

### I.    Patriot Project

Plaintiff Harper Construction is a general contractor whose primary client is the U.S. Government. (J. Harper Decl. ¶ 3, ECF No. 17-1.) In 2007, the Government awarded Harper Construction a contract to build a U.S. Army training facility for the Patriot Missile System in Fort Sill, Oklahoma ("Project"). (Joint Statement of Undisputed Facts ("JSUF") ¶ 1, ECF No. 20.) The scope of work for the Project contemplated a 148,900 square-foot facility that includes classrooms, various training and simulation areas, and administrative offices. (Patriot General Instructional Facility Contract § 00050, J. Harper Decl. Ex. A.)

To complete the Project, "Harper Construction hired design and engineering professionals, suppliers, and various subcontractors." (JSUF ¶ 2.) These subcontractors included Plaintiff Harper Mechanical Contractors, which was formerly known as Harper Grading, LLC. (*Id.* at 2:4–6, ¶ 2.) Harper Construction hired Harper Mechanical to perform demolition, grading, and other work at the Project.[1] (*Id.*) Over the next year and a half, Harper completed the Project, and the

---

[1] Where appropriate, the Court collectively refers to Plaintiffs Harper Construction and Harper Mechanical as simply "Harper."

Government "conducted a Final Inspection of the Project on February 4, 2009." (*See id.* ¶¶ 3–6.)

## II.    National Union's Insurance Policy

Defendant National Union issued Commercial General Liability Policy No. GL 161-74-28 ("Policy") to Harper Construction. (JSUF ¶ 7; Policy, Counterclaim Ex. 1, ECF No. 4 at 27–103.)  The Policy was effective from January 1, 2008, to January 1, 2009, and it provides for up to $1 million in coverage for each occurrence, with a $2 million general aggregate limit. (Policy at 3.)[2]  An endorsement to the Policy names Harper Mechanical as an additional insured. (*See id.* at 75.)

The Policy's Insuring Agreement provides that National Union "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Policy § 1, ¶ 1.) National Union has "the right and duty to defend the insured against any 'suit' seeking those damages." (*Id.*)  That said, an endorsement to the Policy modifies the Insuring Agreement's coverage by limiting the amount National Union is obligated to expend for defense costs. (*Id.* at 50–52.)  The Defense Costs Within Policy Limits Endorsement ("Defense Costs Limits Endorsement") provides:

> Our right and duty to defend such claims or "suits" end when we have exhausted the limits available . . . for either payments of judgments or settlements or defense costs, as such costs are described in . . . this endorsement . . . .

(*Id.* at 50.)  The Policy also contains numerous other endorsements that expand or limit the Insuring Agreement's coverage. (*Id.* at 23–77.)

---

[2] The Court cites to the Policy's paragraph and section numbers when available. Otherwise, the Court uses the exhibit pages imprinted on the copy of the Policy attached to National Union's Counterclaim.

– 3 –

### III.  Problems at the Project

"After the Project was constructed and turned over to the U.S. Government [in February 2009], Harper Construction was informed in December 2010 of property damage at the Project including, but not limited to, gypsum wallboard cracks and binding doors." (JSUF ¶ 13; *see also id.* ¶ 6.)  In early 2011, Harper conducted repairs at the Project, but the problems "continued to appear after the corrective [action]." (*Id.* ¶ 14.)  Then, in July 2013, the Government sent two letters to Harper Construction requesting an investigation of the problems at the Project and asking that the company propose a plan to correct the issues. (*Id.* ¶¶ 15–16.)  Several months later, "Harper Construction and U.S. Government personnel participated in a mutual agreement meeting to establish a methodology for monitoring the Project to determine the cause of gypsum wallboard cracks." (*Id.* ¶ 17.)  During 2013 and 2014, Harper also "conducted on-site investigations and third-party reviews to determine the cause of the cracks and binding doors." (*Id.* ¶ 14.)

In August 2014, as Harper continued to investigate the cause of the problems, one of the Government's engineers threatened to escalate matters, expressing to Harper:

> I understand the need for due diligence and am trying to be reasonable in affording ample opportunity for so doing but lack of action is resulting in loss of patience on this end.  Should you not close in on resolution and lay out a prudent plan to remediate in a prompt and orderly manner, I will be left with little recourse but to initiate pursuit of more formal administrative recourse.  Need your help bringing this to a head quickly.

(Counterclaim Ex. 9; JSUF ¶ 18.)  Harper Construction's President also submits a declaration stating that the "Government advised that if Harper Construction did not repair the property damage, the U.S. Government would demolish the Patriot Project and force Harper Construction to re-build the facility from the ground up at its own cost." (J. Harper Decl. ¶ 9.)  "The U.S. Government also threatened to lodge complaints with Harper Construction's bonding company." (*Id.*)

Further, in a "letter dated January 20, 2015, the U.S. Government requested, in part, that Harper Construction develop a definite plan of action and a timeline for conducting testing and analysis." (JSUF ¶ 19.) In response, on April 10, 2015, Harper Construction submitted a corrective action plan. (*Id.* ¶ 20.)

## IV. Harper's Claim with National Union

On April 2, 2015—approximately four years after the Government first notified Harper of problems at the Project—Harper Construction's insurance broker submitted a claim to National Union by e-mail, stating:

> In 2008 Harper Construction built a project called the Patriot Training Facility. They used a grading contractor, Harper Grading, to do the grading. Harper Grading is NOT owned by Harper Construction. Recently, small cracks appeared in some of the building's walls. It appears water runs under the building causing the building to move up and down. Upon investigation, it appears the fill used in the grading was partially good and partially bad. In order to stop the water from going under the building, Harper Construction is looking at different options. Harper Construction is looking at Harper Grading for the cost of repairs. Harper Grading was insured by [National Union] during the grading work, (see attached certificate), and Harper is looking to [National Union] for the needed work costs.

(JSUF ¶ 21.) On May 7, 2015, National Union acknowledged receipt of the claim and requested documents and information from Harper Construction, including "contract documents," "[a]n explanation of the nature of the alleged damages related to Harper's work," and "[a] summary of any corrective work Harper may have done after completion of its original contracts." (*Id.* ¶ 22.) National Union further stated that it would investigate the claim, but cautioned that it was "reserving all of its rights and defenses based upon the Policy and/or applicable law." (Counterclaim Ex. 13; *see also* JSUF ¶ 22.)

Over the next year and a half, Harper Construction corresponded "numerous times" with National Union to provide the insurer with more information to support

Harper's claim.  (J. Harper Decl. ¶ 21, Ex. G.)  During this time, Harper periodically updated National Union regarding the costs the construction company claimed it had incurred to investigate and repair the Project's problems, which soon ballooned to well over a million dollars.  (JSUF ¶¶ 23–27.)

Toward the end of 2016 and early 2017, Harper Construction increasingly pressed National Union regarding the status of Harper's claim.  (JSUF ¶¶ 43–44.)  Then, on March 27, 2017, National Union sent Harper a letter denying coverage for the claim, stating:

> Based on the information received to date, it does not appear that this matter involves a lawsuit or any legal obligation of Harper Construction or Harper Grading to pay damages because of "property damage" to which the Policy applies, or any judgment against Harper Construction or Harper Grading.  Further, even in the event this matter involved such a claim, it does not appear that this matter involves any "property damage" that took place during the effective dates of the Policy.  Finally, it appears based on the information available to date that the wrap exclusion to the Policy would preclude coverage for claims arising out of Harper Construction's work at the Project.

(Counterclaim Ex. 19; JSUF ¶ 29.)  National Union further explained its decision regarding the potential duty to defend Harper:

> National Union has not been provided with any information indicating that the Claim at issue involves a "suit" within the meaning of Policy.  Harper Construction has instead provided National Union with information indicating that the Army is allowing Harper Construction to propose remedies to the soils issues and that Harper Construction is voluntarily performing investigation of the issue and providing estimates to [remedy the Project's problems].  Accordingly, National Union has no duty to defend or indemnify Harper Construction and/or Harper Grading . . . .

(Counterclaim Ex. 19; JSUF ¶ 29.)

## V.  Procedural History

On January 30, 2018, Harper commenced this action in San Diego County Superior Court.  (Compl., ECF No. 1-2.)  The Complaint asserts various claims

against National Union, including breach of contract, declaratory relief, and intentional misrepresentation.  (*Id.* ¶¶ 8–65.)  The gravamen of Harper's claims is that National Union wrongfully denied coverage and failed to defend and indemnify Harper with respect to the Government's demands to investigate and repair the problems at the Project.  (*See id.*)  Harper states it has incurred $1,809,029.43 in costs to respond to the Government's demands as of September 2018.  (J. Harper Decl. ¶ 18.)

National Union removed the action to this Court based on diversity jurisdiction.  (Notice of Removal, ECF No. 1; *see also* ECF Nos. 2–3.)  National Union then filed a Counterclaim against Harper that raises several claims for declaratory relief.  (Counterclaim ¶¶ 42–52, ECF No. 4.)  National Union now moves for summary judgment on several of Harper's causes of action.

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to

establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252)). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## ANALYSIS

To resolve National Union's motion, the Court must interpret the commercial general liability ("CGL") insurance policy issued by National Union to Harper Construction. Neither party disputes that California law governs the Policy in this diversity action.

"An insurance policy is, fundamentally, a contract between the insurer and the insured." *Stein v. Int'l Ins. Co.*, 217 Cal. App. 3d 609, 613 (1990). In exchange for

the insured's premiums, the insurer makes promises that protect the insured "against the risk of loss." *Buss v. Superior Court*, 16 Cal. 4th 35, 44 (1997). Two promises are at issue here: National Union's duties to defend and indemnify Harper under the Policy. These two duties "lie at the core" of a standard CGL policy. *See Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 958 (2001) ("*Powerine*"). They are also complementary but distinct obligations. *Id.*

The first obligation, the duty to indemnify, requires the insurer to "indemnify claims that are covered by the policy." *Risely v. Interinsurance Exch. of the Auto. Club*, 183 Cal. App. 4th 196, 208 (2010). This duty "entails the payment of money in order to resolve liability," but it "arises only after liability is established." *Buss*, 16 Cal. 4th at 46. Hence, "an insurer's obligation to actually 'cut a check' and *transfer funds* in performance of its duty to indemnify does not arise until there is a judgment or approved settlement for a sum of money due." *Fluor Corp. v. Superior Court*, 61 Cal. 4th 1175, 1220 (2015); *see also Powerine*, 24 Cal. 4th at 958.

In comparison, the duty to defend "entails the rendering of a service, viz., the mounting and funding of a defense in order to avoid or at least minimize liability." *Buss*, 16 Cal. 4th at 46 (citations omitted). And whereas the duty to indemnify only applies to claims actually covered by the policy, the duty to defend extends "to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed." *Id.* at 45–46. Further, although the duty to indemnify arises after liability is established, the duty to defend generally "arises when the insured tenders defense of the third party lawsuit to the insurer." *See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 886 (1998). Accordingly, the duty to defend is broader than the duty to indemnify. *Buss*, 16 Cal. 4th at 46.

California courts have developed these guidelines on the duties to defend and indemnify when interpreting standardized CGL policies. *See, e.g.*, *Powerine*, 24 Cal. 4th at 950; *Foster-Gardner*, 18 Cal. 4th at 864 n.3; *see also Dart Indus., Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1074 n.5 (2002) (noting standardized

forms "are often employed industrywide"). Insurers, however, are often willing to use endorsements "to modify or change the standard forms," and occasionally "the policy issued is entirely nonstandard and drafted for the particular risk undertaken'—a so-called 'manuscript' policy." *Dart Indus.*, 28 Cal. 4th at 1074 (quoting *Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 17 Cal. 4th 38, 46 n.1 (1997)). Thus, the precise contours of an insurer's duties to defend and indemnify ultimately depend upon the specific text of the parties' policy. *See, e.g.*, *Pulte Home Corp. v. Am. Safety Indem. Co.*, 14 Cal. App. 5th 1086, 1106 (2017) (interpreting CGL policies containing "manuscript" endorsements for naming additional insureds); *see also County of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 410 (2005) (interpreting a nonstandard excess third party liability policy).

In seeking partial summary judgment, National Union relies on the Policy's Insuring Agreement and "long-standing rulings of the California Supreme Court" interpreting standard policy language to argue the insurer indisputably lacks a duty to defend or indemnify Harper in these circumstances. (Mot. 1:8–2:13.) Harper argues this Court should adopt a different interpretation of the Policy that would preclude summary judgment. (Opp'n 8:15–21.) Accordingly, the Court first reviews the framework for interpreting insurance policies under California law. The Court then analyzes the text of the Policy to determine whether Harper's dispute with the Government triggered National Union's duties to defend and indemnify Harper. Finally, the Court addresses Harper's bad faith, estoppel, and discovery-related arguments.

## I.    Policy Interpretation Framework

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003); *see also Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264

(1992) ("While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.").

In interpreting an insurance policy, the court will "infer the parties' intent, if possible, solely from the written provisions of the contract." *Doyle v. Fireman's Fund Ins. Co.*, 21 Cal. App. 5th 33, 37 (2018) (citing Cal. Civ. Code § 1639). "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." *Hovannisian v. First Am. Title Ins. Co.*, 14 Cal. App. 5th 420, 430 (2017) (citation omitted) (quoting *Ameron Int'l Corp. v. Ins. Co. of Pa.*, 50 Cal. 4th 1370, 1378 (2010)). The court "must also 'interpret the language in context, with regard to its intended function in the policy.'" *McMillin Mgmt. Servs., L.P. v. Fin. Pac. Ins. Co.*, 17 Cal. App. 5th 187, 201 (2017) (quoting *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 288 (2014)). "Significantly, the provisions of an endorsement prevail over conflicting provisions in the body of the policy, if the relevant language of the endorsement is conspicuous and free from ambiguity." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1217 (2004).

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). If there is an ambiguity in the policy, the court "must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations." *Bank of the W.*, 2 Cal. 4th at 1265. The insured's objectively reasonable expectations may restrict rather than expand coverage—the insured cannot claim coverage where a reasonable person would not expect it. *Old Republic Ins. Co. v. Superior Court*, 66 Cal. 4th 128, 144 (1998), *disapproved on other grounds by Vandenberg v. Superior Court*, 21 Cal. 4th 815, 841 n.13 (1999). The reasonable expectations inquiry "requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and

'common sense.'" *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1058 (2002) (quoting *Bank of the W.*, 2 Cal. 4th at 1265).

Finally, if these rules do not resolve the issue, the last step is for the court to construe the policy's ambiguity against the insurer. *E.g.*, *St. Paul Fire*, 101 Cal. App. 4th at 1058.

## II.     Duty to Defend

To assess National Union's duty to defend, the Court initially looks to the Policy's insuring clause.  A policy's "insuring clause is the foundation of the agreement and forms the basis for all obligations owed to the insured." *Dominguez v. Fin. Indem. Co.*, 183 Cal. App. 4th 388, 400 (2010) (quoting Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation § 3:71 (The Rutter Group 2009)).  Section I, Paragraph 1 of the Policy, titled "Insuring Agreement," provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages . . . to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages . . . to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

(Policy § 1, ¶ 1.)  This text echoes the standard language found in many other CGL policies.  *See, e.g.*, *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 220 n.2 (2018); *Hartford*, 59 Cal. 4th at 285; *Am. States Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 223 Cal. App. 4th 495, 502 (2014); *see also* Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation § 7:513, (The Rutter Group 2018).

Further, unlike antiquated CGL policies that left the term "suit" undefined, *see Foster-Gardner*, 18 Cal. 4th at 864, the Policy provides a definition:

– 12 –

> "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:
>
>> a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
>>
>> b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(Policy § V, ¶ 18.)

Based on these provisions, National Union argues the undisputed facts demonstrate it has no duty to defend Harper because the Government's demands are not a "'suit' seeking . . . damages" covered by the Policy. (Mot. 10:2–12:9.) And although the Policy provides National Union with the "discretion" to "investigate any 'occurrence' and settle any claim . . . that may result," (Policy § 1, ¶ 1), National Union argues the Policy does not obligate the company to defend a claim—such as the Government's demand for repairs—that has not ripened into an actual "suit." (Mot. 10:1–12:9.) *See, e.g.*, *Foster-Gardner*, 18 Cal. 4th at 878–88. In response, Harper advances two theories based on the Policy's definition of "suit" and the Defense Costs Limits Endorsement to reach the opposite conclusion.

### A. Definition of "Suit"

Harper first argues in its Opposition that the "Government's demand to Harper is a potential 'suit'" under the Policy because the Contract Disputes Act ("CDA") includes administrative and court proceedings. (Opp'n 14:4–12.) Harper made a similar but distinguishable claim at oral argument: Harper argued the Government's demand to repair the training facility was part of a dispute resolution proceeding under the CDA. (ECF No. 29.) Harper therefore argued it was asking for defense of a "suit" under the Policy when it submitted a claim to National Union. (*Id.*)

With certain exceptions, the CDA applies to contracts "made by an executive agency" for, among other things, "the procurement of construction, alteration, repair, or maintenance of real property." 41 U.S.C. § 7102(a). As a military department, the Department of the Army is an executive agency under the CDA. 5 U.S.C. § 102; 41 U.S.C. § 7102(a)(3). Thus, the CDA applies to the contract between Harper Construction and the Army Corps of Corps of Engineers to construct the Project. *See id.* § 7102(a)(3); *see also, e.g.*, *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1360 (Fed. Cir. 2007) (adjudicating dispute under the CDA arising from a contract between the Army Corps of Engineers and a contractor to build a facility at a military airfield). Indeed, Harper Construction and the Government's contract expressly incorporates the CDA's dispute resolution procedures. (JSUF ¶ 38; Patriot General Instructional Facility Contract § 60.)

Under the CDA, "[e]ach claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103. The "contracting officer" is "an individual who, by appointment in accordance with applicable regulations, has the authority to make and administer contracts and to make determinations and findings with respect to contracts." *Id.* § 7101(6). "Because the CDA does not clearly define the elements of a valid claim, the courts look to the relevant Federal Acquisitions Regulations ('FAR') for guidance." *JEM Transp., Inc. v. United States*, 120 Fed. Cl. 189, 198 (2015) (citations omitted) (citing 41 U.S.C. § 1703; *J.P. Donovan Const., Inc. v. Mabus*, 469 F. App'x 903, 906 (Fed. Cir. 2012)). Under the FAR, a claim "means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to [the] contract." 48 C.F.R. § 52.233–1(c). For example, the Government may make a nonmonetary claim under the CDA by demanding, pursuant to a contract's inspection

18cv0471

clause, that a contractor remedy defective work. *See, e.g.*, *Garrett v. Gen. Elec. Co.*, 987 F.2d 747, 748 (Fed. Cir. 1993).

"The contracting officer's decision on a claim is final and conclusive and is not subject to review . . . unless an appeal or action is timely commenced as authorized" by the CDA. 41 U.S.C. § 7103. The CDA provides two avenues to challenge the contracting officer's adverse decision: (a) an appeal to an agency board of contract appeals, or (b) an action in the U.S. Court of Federal Claims. *Id.* § 7104.

The California Supreme Court analyzed an insurer's duty to defend proceedings under the CDA in *Ameron International Corp. v. Insurance Company of State of Pennsylvania*, 50 Cal. 4th 1370 (2010). There, two contractors appealed to the relevant agency's board of contract appeals after they received unfavorable decisions from the Government's contracting officer. *Id.* at 1376. To do so, the contractors had to file an administrative complaint, which the Government had an opportunity to answer. *Id.* The contractors then participated in a 22-day proceeding before an administrative law judge, "in which witnesses testified and were cross-examined." *Id.* The relevant CGL policies did not define the term "suit." *Id.* at 1375–76. But the court concluded that "[a] reasonable policyholder would recognize such proceedings as a suit and would expect to be defended and, if necessary, indemnified by its insurer." *Id.* at 1386. Further, the court addressed its prior decision in *Fostner-Gardner*, 18 Cal. 4th at 878–82, that had differentiated between threats to take legal action—which do not give rise to an insurer's duty to defend— and lawsuits—which do trigger the duty. *Ameron*, 50 Cal. 4th at 1386–87. The court explained: "In this case, the agency board proceeding was not a 'threat' to take legal action; it was an administrative adjudicative action that dictates our departure from *Foster-Gardner*'s rule." *Id.*

Harper's argument that the Government's demands triggered National Union's duty to defend because the demands were part of a proceeding under the CDA is unpersuasive. Viewing the evidence in the light most favorable to Harper, the

18cv0471

Government's written demands to inspect and correct defects at the Project could be considered a claim under the CDA. *See JEM Transp.*, 120 Fed. Cl. at 198. And had the Government and Harper's dispute progressed to an appeal before the Armed Services Board of Contract Appeals or an action in the Court of Federal Claims, National Union may have been obligated to defend Harper from such a "suit" under the Policy. (*See* Policy § V, ¶ 18.) *See Ameron*, 50 Cal. 4th at 1376.

There is no evidence, however, that the Government's potential claim was ever submitted for "a written decision by the contracting officer," which is the first step in the dispute resolution process under the CDA.[3] *See* 41 U.S.C. § 7103; *cf. Garrett*, 987 F.2d at 748 (noting that "[a]fter further meetings and correspondence, the contracting officer (CO) issued a final decision requiring [General Electric] to correct the problem at no additional cost to the Navy"). A Government employee threatened to "initiate pursuit of more formal administrative recourse," (JSUF ¶ 18), but "threats to take legal action" are insufficient to trigger National Union's duty to defend, *see Ameron*, 50 Cal. 4th 1370.[4] Simply put, in applying the first portion of the Policy's definition of "suit," there is no evidence that Harper was faced with "a civil proceeding in which damages . . . are alleged" under the CDA—or otherwise—that triggered National Union's duty to defend. (Policy § V, ¶ 18.)

Nor does Harper demonstrate National Union had a duty to defend based on the portion of the Policy's "suit" definition concerning "[a]ny other alternative dispute resolution proceeding." (Policy § V, ¶ 18.) The CDA incorporates

---

[3] The CDA further provides: "The contracting officer's decision shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter." 41 U.S.C. § 7103. The Government's contracting officer sent letters to Harper, but none of these letters appears to be a decision on a claim under the CDA. *See id.* Moreover, Harper's Opposition does not raise an argument on this issue.

[4] National Union lodges a series of objections to Harper's evidence, including Harper's President's statement that the Government threatened to force Harper to rebuild the Project at its own cost. (ECF No. 19-1.) Having reviewed these objections, they do not impact the Court's ruling on National Union's motion. For example, even assuming that the Government made additional threats to Harper regarding the Project, these threats are not a "suit" under the Policy that trigger National Union's duty to defend. Hence, the Court denies as moot National Union's evidentiary objections seeking to exclude this evidence and other items.

alternative dispute resolution ("ADR") via the Administrative Dispute Resolution Act. *See* 5 U.S.C. §§ 571–584; *see also* 41 U.S.C. § 7103 (providing that "a contractor and a contracting officer may use any alternative means of dispute resolution under subchapter IV of chapter 5 of title 5, or other mutually agreeable procedures, for resolving claims"). ADR is defined as "any procedure that is used to resolve issues in controversy, including, but not limited to, conciliation, facilitation, mediation, factfinding, minitrials, arbitration, and use of ombuds, or any combination thereof." 5 U.S.C. § 571(3). The Government and Harper Construction's contract also mentions ADR when incorporating the CDA's dispute resolution procedures. (*See* Patriot General Instructional Facility Contract § 60.)

Yet, the fact that the CDA and the Project's contract incorporate ADR is insufficient to trigger National Union's duty to defend. Aside from arbitration, the Policy's "suit" definition encompasses ADR "proceeding[s]" only when "the insured submits" to the ADR proceeding with National Union's "consent." (Policy § V, ¶ 18.) It follows that National Union has no obligation to defend an ADR proceeding based on this portion of the "suit" definition unless the insurance company first provides its consent to the proceeding. Thus, even if Harper's interactions with the Government amounted to a type of ADR "proceeding," Harper does not introduce evidence upon which a reasonable factfinder could conclude Harper submitted to this ADR proceeding with National Union's consent—a prerequisite to the insurer's defense obligation.[5]

---

[5] Harper claims in its Opposition that it incurred "substantial costs to meet the U.S. Government's demands" with National Union's "knowledge and consent." (Opp'n 7:6–7.) Yet Harper does not provide a citation to the record for its claim that National Union consented to its expenditures, and the Court rejects Harper's unsupported claim. *See* Fed. R. Civ. P. 56(c)(1) (requiring a party asserting that a fact is genuinely disputed to support it by "citing to particular parts of materials in the record"). The Court notes that Harper's brief does not otherwise mention the term "consent." In any event, when Harper submitted a claim to National Union, Harper had already been engaged in a conciliation effort with the Government for several years. (*See* JSUF ¶¶ 14, 17, 21.)

In sum, when the evidence is viewed in the light most favorable to Harper, the evidence does not demonstrate that Harper faced a civil proceeding seeking damages under the Policy or that Harper submitted to an ADR proceeding with National Union's consent. Consequently, the Court rejects all of Harper's arguments concerning the duty to defend that are based on the Policy's definition of "suit."

### B. Defense Costs Limits Endorsement

Harper's second theory concerning the duty to defend centers on the Defense Costs Limits Endorsement. As mentioned, this endorsement modifies the extent of National Union's duty to defend. In the body of the Policy, the Insuring Agreement provides that National Union's "right and duty to defend ends when" the insurer has "used up the applicable limit of insurance in the payment of judgments or settlements under" the Policy. (Policy § 1, ¶ 1.) In the Defense Costs Limits Endorsement, that provision is replaced with the following text:

> Our right and duty to defend such claims or "suits" end when we have exhausted the limits available, as provided under [the Policy] for either payments of judgments or settlements or defense costs, as such costs are described in . . . this endorsement . . . This applies both to claims and "suits" pending at that time and those filed thereafter.

(*Id.* at 50.) The effect of this amendment is to change the Policy into a "burning limits" policy:

> Under most liability policies, the insurer's duties to indemnify and to defend are separate obligations. Thus, amounts spent in defense of a third party claim do not reduce the indemnity limits available to settle the claim or pay an adverse judgment . . . . However, under some policies, the indemnity limits *are reduced* by the legal fees and other defense costs expended. I.e., as the costs to defend the third party claim increase, the indemnity coverage available to settle that claim *decreases*. (These are commonly referred to as "self-consuming" or "burning limits" provisions.)

Hon. H. Walter Croskey et al., California Practice Guide: Insurance Litigation § 7:3536 (The Rutter Group 2018) (citations omitted); *see also Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 402 (2005); *Aerojet-Gen.*, 17 Cal. 4th at 76 n.29.

Harper, however, ascribes additional meaning to the Defense Costs Limits Endorsement. Harper focuses on the endorsement's initial phrase, "Our right and duty to defend such claims or 'suits' . . . ." (Policy at 50.) Harper argues this "conspicuous and unambiguous" language expands National Union's duty to defend "suits" to also include a duty to defend any potential "claims" under the Policy. (Opp'n 17:5–24:2.) And, to the extent that this portion of the endorsement conflicts with the Policy's remaining text, Harper argues the endorsement should control and be construed in favor of the insured and its reasonable expectations regarding coverage. (*Id.*) The effect of this interpretation would be that National Union had the obligation to step in and defend Harper from the Government's demands once the insurer became aware of the Government's "claim."

The Court is not convinced. The fragment of the Policy's text that Harper relies upon is found in a provision that plainly addresses when National Union's duty to defend ends—not when the duty arises. Indeed, this text must be interpreted "in context, with regard to its intended function in the policy." *See McMillin*, 17 Cal. App. 5th at 201. The Court may also rely upon the Policy's structure and organization to interpret the relevant endorsement's text. *See Fire Ins. Exch. v. Superior Court*, 116 Cal. App. 4th 446, 459–60 (2004). And when the endorsement is placed into context, the fragment at issue cannot be reasonably interpreted to broaden National Union's duty to defend to include any "claim" that has not yet ripened into a "suit."

As described above, the insurer's duty to defend is first mentioned at the start of the Policy's Insuring Agreement. In tracking the language found in standard CGL policies, the Insuring Agreement states that National Union has "the right and duty to defend the insured against" suits seeking damages to which the Policy applies, but

has no obligation to defend suits not seeking such damages. (Policy § 1, ¶ 1.) The insurer also has the "discretion" to "investigate any 'occurrence and settle any claim or 'suit' that may result." (*Id*.) This language plainly obligates National Union to defend "suits," but does not require the insurer to defend claims that have not yet ripened into suits, which the insurer nonetheless has the discretion to investigate and settle. *See, e.g.*, *Foster-Gardner*, 18 Cal. 4th at 879–82. The provision of the Defense Costs Limits Endorsement at issue does not amend this language in the Insuring Agreement. Rather, as mentioned above, the endorsement amends a subsequent section that discusses when the duty to defend terminates:

> 1. Insuring Agreement
>
>> a. We will pay those sums that the insured becomes legally obligated to pay as damages . . . to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages . . . . We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:
>>
>>> (1) The amount we will pay for damages is limited as described in Section Ill - Limits Of Insurance; and
>>>
>>> (2) ~~Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.~~ <u>Our right and duty to defend such claims or "suits" end when we have exhausted the limits available, as provided under SECTION III - LIMITS OF INSURANCE for either payments of judgments or settlements or defense costs . . . .</u>
>>
>> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

(*See* Policy § 1, ¶ 1, & at 50.)[6] As seen, the endorsement specifically amends a section of the Policy that limits coverage by providing the duty to defend terminates

---

[6] The strikethrough portion of this quotation is the original text of the Policy, which is deleted by the Defense Costs Limits Endorsement. The underlined portion is the amendment added by the endorsement in place of the original text. Like the parties, the Court combines these two

when the Policy's limits have been exhausted to pay settlements or judgments.  The endorsement does not amend the grant of coverage and the initial discussion of the duty to defend in Section 1.a.  Thus, when placed into context, the "intended function" of the Defense Costs Limits Endorsement is to modify when the duty to defend terminates—not when it arises.  *See McMillin*, 17 Cal. App. 5th at 201.  Placing the provision into context also undercuts Harper's interpretation because the amended text follows a "But" at the end of the umbrella paragraph of the Insuring Agreement.  (*See* Policy § 1, ¶ 1, & at 50.)  This word indicates that the following two sections limit—not expand—the grant of coverage in the Insuring Agreement.

Further, because placing the Defense Costs Limits Endorsement into context renders Harper's interpretation unreasonable, the Court is unmoved by Harper's reliance on other principles of insurance policy interpretation to support its strained reading of the Policy.  For instance, in arguing that the endorsement expands coverage to include a defense of claims, Harper relies on the rule that provisions granting coverage are to be interpreted broadly to afford the greatest possible protection to the insured.  (Opp'n 14:20–23, 17:17–18 (citing *White v. W. Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985)).)  But the Defense Costs Limits Endorsement is not a provision granting coverage.  As shown above, the intended function of the amendment is plainly to limit coverage under the Policy by circumscribing the insurer's obligation to pay defense costs.  Hence, this principle does not support Harper's interpretation.

Harper also highlights that "a specific provision relating to a particular subject governs in respect to that subject as against a general provision, even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates."  (Opp'n 15:7–10 (citing *Jane D. v. Ordinary Mut.*, 32 Cal. App. 4th 643, 651 (1995)).)  Yet this principle, too, fails to substantiate

---

items to illustrate how the Insuring Agreement reads after the endorsement is inserted into the Policy.  (*See* Mot. 12:25–13:18; Opp'n 18:13–28.)

Harper's interpretation. The Policy's specific provisions that address when National Union's duty to defend arises are found in the initial paragraph of the Insuring Agreement, and they are left unchanged by the Defense Costs Limits Endorsement. (*See* Policy § 1, ¶ 1, & at 50.)  The fragment relied upon by Harper is part of a provision that addresses a different "particular subject"—when the duty to defend terminates.  Indeed, the provision more generally refers back to "such claims or 'suits'"—items that are first mentioned in the prior provisions of the Policy's Insuring Agreement.  Hence, the Defense Costs Limits Endorsement is not the more specific provision addressing the issue at hand, and this principle does not validate Harper's interpretation.

In addition, Harper places stock in the rule that "the provisions of an endorsement prevail over conflicting provisions in the body of the policy, if the relevant language of the endorsement is conspicuous and free from ambiguity." *Haynes*, 32 Cal. 4th at 1217.  (*See* Opp'n 14:13–16, 15:1–3, 22:3–5.)  But when the phrase at issue is interpreted in context, the Defense Costs Limits Endorsement does not plainly conflict with the Policy; the endorsement amends a provision limiting coverage for defense costs and does not change the provisions addressing when the duty to defend arises.  Regardless, the fragment at issue also does not conspicuously provide that National Union assumes the duty to defend any claim that has not ripened into a "suit" under the Policy.  Accordingly, this principle does not persuade the Court to abandon the interpretation that is reached when the endorsement's text is read "in context, with regard to its intended function in the policy." *See McMillin*, 17 Cal. App. 5th at 201.

Finally, the Court considers Harper's contention that the word "and" in the Defense Costs Limits Endorsement's phrase "right *and* duty to defend such suits and claims" means National Union has assumed the duty to defend claims. (Policy at 50 (emphasis added); *see also* Opp'n 15:15–21, 17:17–20, 18:3–12, 20:1–9.)  The endorsement's use of an "and"—instead of an "or"—implicitly suggests that

National Union has already agreed to assume the duty to defend both claims and suits. *Cf. Baker v. Nat'l Interstate Ins. Co.*, 180 Cal. App. 4th 1319, 1336 (2009) (reasoning that the use of the disjunctive conjunction "or" between two phrases following an exclusionary clause makes it clear that the exclusion applies to either phrase). The Court is not convinced, however, that the presence of an "and" in the endorsement changes the outcome. Harper's interpretation is unreasonable notwithstanding this conjunction because the endorsement does not conspicuously provide that National Union is assuming the duty to defend pre-suit claims. Rather, the endorsement specifically addresses when the duty to defend elapses and does not amend the Insuring Agreement's prior provision regarding the defense of "suits" and investigation of claims.

That said, even if Harper's interpretation of the Policy was reasonable, this interpretation would be but one of two reasonable constructions of the text. To resolve the resulting ambiguity, the Court would next determine whether coverage is consistent with Harper's objectively reasonable expectations. *See, e.g.*, *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763 (2001). Harper argues reading the Defense Costs Limits Endorsement to expand coverage would be consistent with its expectations because Harper "would otherwise never receive benefits under the Policy for which it paid a premium." (Opp'n 20:10–13.) Harper explains that it would never receive benefits under the policy because it would have to invite a suit to obtain coverage and jeopardize its relationship with the Government, its primary client. (*Id.* 20:12–20.)

The Court is again unpersuaded. The "expectations of the insured are examined at the time the contract is made." *Safeco*, 26 Cal. 4th at 766. Although a lack of coverage may now appear unfair to Harper in hindsight, the proper inquiry is: would reasonable insureds expect their CGL policy to require their insurer to step in and defend them in these circumstances? *See id.* And the answer is no. The Government never commenced a lawsuit or comparable administrative proceeding

against Harper. And by the time Harper submitted its claim to National Union in April 2015, Harper had already conducted some repairs at the Project in 2011 and had been coordinating with the Government to investigate and resolve the root issue for several years. (JSUF ¶¶ 14, 17, 21.) Simply put, Harper does not demonstrate that a reasonable insured, at the time of contracting, would expect to be defended under its CGL policy in these circumstances.[7] *Cf. Ameron*, 50 Cal. 4th at 1386 (providing the duty to defend is not triggered by mere "threats to take legal action"); *see also St. Paul Fire*, 101 Cal. App. 4th at 1058 (providing courts must "apply a little common sense to determine which of the two reasonable interpretations of the additional insured endorsement meets the *objectively* reasonable expectations of . . . the party claiming coverage").

In short, Harper unpersuasively relies on a fragment of the Defense Costs Endorsement to argue National Union breached its duty to defend. Placing the endorsement into context demonstrates its function is to limit coverage for defense costs—not to expand the duty to defend to include claims that have not ripened into a "suit" under the Policy. Overall, the Court rejects Harper's interpretation of the Policy, and Harper fails to demonstrate National Union breached its obligation to defend Harper under the Policy. Consequently, National Union is entitled to summary judgment on this issue.

---

[7] Harper also relies on another excerpt of the Defense Costs Limits Endorsement to support its interpretation. (*See* Opp'n 17:13–18:2.) This subsequent portion of the endorsement provides: "[National Union] will pay, as part of the limit of insurance, as described in Section C. – Limits of Insurance Revision (below), *with respect to any claim or 'suit' the following defense costs . . . .*" (Policy at 51 (emphasis added).) When read in context, this excerpt similarly does not broaden National Union's duty to defend to include pre-suit claims. The excerpt is part of a provision addressing what defense costs National Union will pay when the insurer is providing a defense— not when the duty to defend arises. Indeed, like the other fragment of the endorsement Harper relies on, this second excerpt does not amend the portion of the Insuring Agreement that addresses the insurer's duty to defend "suits" and its discretion to investigate and settle claims. Further, yet another prior portion of the endorsement provides National Union will pay the costs addressed in this second excerpt when it is "control[ing] the defense of a claim or 'suit.'" (Policy at 50.) Thus, for many of the same reasons discussed previously, this segment of the Defense Costs Limits Endorsement also does not make Harper's interpretation of the Policy reasonable.

### III.    Duty to Indemnify

National Union also seeks summary judgment regarding its duty to indemnify Harper under the Policy.  As mentioned above, the duty to indemnify generally "arises only after liability has been established."  *See Am. States Ins. Co.*, 223 Cal. App. 4th at 506.  Therefore, the insurer need only "'cut a check' and *transfer funds* in performance of its duty to indemnify" once "there is a judgment or approved settlement for a sum of money due."  *Fluor Corp*, 61 Cal. 4th at 1220.

National Union is entitled to summary judgment on this issue.  The Policy contains a standard indemnity provision.  This text provides that National Union "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Policy § 1, ¶ 1(a).)  No court, arbitrator, or administrative adjudicator has ordered Harper to pay "damages" to the Government or anyone else.  Consequently, there are no sums Harper is "legally obligated to pay as damages" for National Union to indemnify. (*See id.* § 1, ¶ 1(a).)  *See Powerine*, 24 Cal. 4th at 960–64; *see also Buss*, 16 Cal. 4th at 46 (providing the duty to indemnify "arises only after liability is established").

In addition, because the duty to defend is broader than the duty to indemnify, "[w]here there is a duty to defend, there may be a duty to indemnify; but where there is no duty to defend, there cannot be a duty to indemnify."  *Powerine*, 24 Cal. 4th at 958.  The Court has already concluded that National Union had no obligation to defend Harper in these specific circumstances.  Hence, National Union also lacks a duty to indemnify Harper because this duty is narrower than the duty to defend.  *See id.*

In sum, because the undisputed facts demonstrate Harper is not legally obligated to pay damages under the Policy that would trigger National Union's duty to indemnify, and because National Union did not have a duty to defend Harper, the insurer is entitled to summary judgment on this basis.

## IV.    Breach of the Implied Covenant

Harper argues that National Union breached the Policy and its obligation to act in good faith by unreasonably failing to fulfill its duties to investigate, defend, settle, and indemnify Harper.  (Opp'n 26:19–31:20.)  National Union contends that Harper cannot bring this claim, however, because National Union did not breach its duties to defend or indemnify Harper.  (Mot. 17:9–18:7.)  The Court has already addressed National Union's defense and indemnity obligations under the Policy.  Harper does not highlight any other express terms of the Policy that it believes National Union breached.  (Opp'n 26:19–30:19.)  Thus, the Court turns to whether Harper may still pursue a breach of contract claim based on the implied covenant of good faith and fair dealing.

"In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing."  *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979).  "Simply stated, the burden imposed is 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"  *Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co.*, 90 Cal. App. 4th 335, 345 (2001) (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 573 (1973)), *disapproved on other grounds by Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 724 (2007).

In the insurance context, "there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause."  *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990).  Therefore, if the insured fails to demonstrate it is entitled to benefits under the policy, the insured cannot maintain a claim for breach of the implied covenant.  *Id.* at 1151, 1153; *see also, e.g.*, *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 408 (2000) ("Of course, without coverage there can be no liability for bad faith on the part of the insurer." (emphasis omitted)).

For the reasons discussed above, National Union indisputably had no obligation to defend Harper because the Government's demands were not a "suit" under the Policy. Nor has the insurer breached its duty to indemnify the contractor. Harper therefore fails to demonstrate that National Union has withheld benefits that are due under the Policy, and Harper does "not have a claim for breach of the implied covenant of good faith and fair dealing." *See, e.g.*, *Brown v. Mid-Century Ins. Co.*, 215 Cal. App. 4th 841, 858 (2013); *see also Love*, 221 Cal. App. 3d at 1152 (rejecting the insureds' contention that "delay in denying a claim constitutes bad faith even if no coverage exists").[8] Thus, summary judgment on Harper's breach of the implied covenant claim is appropriate.

## V. Estoppel

Harper alternatively argues that National Union's motion should be denied because there is a triable issue as to whether National Union should be estopped from asserting its coverage defenses. (Opp'n 30:20–31:20.) "Whenever a party has, by [its] own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, [the party] is not, in any litigation arising out of such statement or conduct, permitted to contradict it." *Westoil Terminals Co. v. Indus. Indem. Co.*, 110 Cal. App. 4th 139, 151 (2003) (quoting Cal.

---

[8] The Court notes that the California Court of Appeal suggested in a footnote that an "insurance company might be liable if it unreasonably delayed in performing an investigation of a claim before concluding there was no coverage and the insured suffered consequential loss as a result of the delay." *Murray v. State Farm Fire & Cas. Co.*, 219 Cal. App. 3d 58, 66 (1990). However, the California Court of Appeal subsequently recognized that this statement was "obiter dictum." *Benavides v. State Farm Gen. Ins. Co.*, 136 Cal. App. 4th 1241, 1253 (2006). The statement also conflicts with the California Supreme Court's later decision in *Waller v. Truck Insurance Exchange, Inc.*, where the court confirmed that when there is "no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." 11 Cal. 4th 1, 36 (1995); *see also Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 918 (N.D. Cal. 2016) (discussing the footnote from *Murray*). Therefore, although Harper does not rely on the *Murray* decision, Harper regardless cannot maintain a claim for breach of the implied covenant on this theory.

Evid. Code § 623).  Four elements must be established for the doctrine of estoppel to apply:  "(1) the party to be estopped must be apprised of the facts; (2) [that party] must intend that [its] conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely upon the conduct to [its] injury."  *City of Goleta v. Superior Court*, 40 Cal. 4th 270, 279 (2006).

In the insurance context, the "well established" rule is "that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom." *R & B Auto Ctr., Inc. v. Farmers Grp., Inc.*, 140 Cal. App. 4th 327, 352 (2006) (quoting *Manneck v. Lawyers Title Ins. Corp.*, 28 Cal. App. 4th 1294, 1303 (1994)).  That said, a few cases suggest estoppel is available where "the insurer's conduct caused" both: (1) "a 'reasonable' belief that [the] insurer was providing coverage," and (2) "detrimental reliance on such conduct."  *See State Farm Fire & Cas. Co. v. Jioras*, 24 Cal. App. 4th 1619, 1628 (1994); *see also Westoil*, 110 Cal. App. 4th at 151.

Assuming estoppel is a viable theory here, Harper does not introduce sufficient evidence to create a triable issue on its estoppel claim.  There is no triable issue because Harper's asserted belief that National Union was providing coverage for Harper's claim is not reasonable as a matter of law.  The insurer's initial response to Harper provided:

> By investigating this matter, National Union is reserving all of its rights and defenses based upon the Policy and/or applicable law. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other policy provisions of the Policy, or any other insurance policies issued or allegedly issued by National Union or any of its affiliates. Furthermore, to the extent National Union determines, after its review of the information requested above, that Harper is entitled to a defense in connection with the above-referenced matter, National Union

18cv0471

expressly reserves any and all rights and defenses in connection with the defense of Harper.

(JSUF ¶ 22, Counterclaim Ex. 13.)  Harper submits evidence demonstrating that it cooperated with National Union's requests for information for the insurer's investigation, and that the insurer's adjuster informed Harper that it was "running this up the ladder" before National Union finally provided a negative coverage decision.  (Opp'n 10:25–12:7; *see also* Harper Decl. Ex. G.)  Harper Construction's President also submits a declaration stating that he "was led to believe that National Union was acting in good faith and that it would pay Harper Construction, in full or in part, for the costs incurred as a result of the U.S. Government's demand."  (Harper Decl. ¶ 21.)  But his belief alone is insufficient.  There must be sufficient evidence to conclude National Union's conduct caused Harper to "reasonably" believe National Union was providing Harper with coverage.  *See Jioras*, 24 Cal. App. 4th at 1628.  Having reviewed Harper's evidence, including the communications from National Union's claims adjuster, it is not reasonable as a matter of law to believe that National Union had shifted from investigating Harper's claim under a reservation of rights to "providing coverage" before the insurer ultimately denied the claim.  *See id.*  Thus, Harper fails to raise a triable estoppel claim that would prevent National Union from asserting its coverage defenses.

## VI.  Future Discovery

Harper also requests that the Court defer a decision on National Union's motion to allow Harper to obtain information from pending document requests and future discovery regarding National Union's claim file.  (Opp'n 31:21–32:7; *see also* Kim Decl. ¶ 7, ECF No. 17-2.)  Harper's counsel further declares: "Harper anticipates that in addition to the National Union claim file, future discovery regarding the underwriting of the Policy and any setting of reserves will be relevant to issues in

this motion including, in part, Harper's reasonable expectations of coverage and the parties' course of performance." (*Id*. ¶ 8.)

Harper's Opposition does not invoke Federal Rule of Civil Procedure 56(d), but the Court construes Harper's request as arising under this provision. Rule 56(d) provides that if a party opposing summary judgment demonstrates it "cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). A party invoking this rule "must identify by affidavit 'the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment.'" *Sec. & Exch. Comm'n v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018) (quoting *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006)).

Deferring a ruling on National Union's motion is not appropriate. Although Harper generally identifies the needed discovery as the insurer's claim file and "future discovery regarding the underwriting of the Policy and any setting of reserves," Harper does not convincingly explain why these items "would preclude summary judgment" on the claims at issue. *See Stein*, 906 F.3d at 833. The interpretation of the Policy is question of law, and the Policy's text does not provide that National Union has a duty to indemnify or defend Harper in these circumstances. Therefore, the Court is unpersuaded that its interpretation of the Policy would be affected by any information regarding National Union's setting of reserves or its claim file. *See Prudential Sec., Inc. v. Dusch*, No. 93-1470-IEG (RBB), 1994 WL 374425, at *4 (S.D. Cal. Mar. 28, 1994) (finding "additional discovery is neither necessary nor appropriate" in part because it would "not alter the interpretation of the parties' contract"); *see also Lakeside Inn, Inc. v. Bank of the W.*, No. 3:14-CV-00473-RCJ, 2015 WL 1331383, at *3 (D. Nev. Mar. 25, 2015) (declining request for further discovery because "contractual interpretation" and application of state law to the "contracts at issue" were "pure matters of law"). In addition, although Harper

mentions a need for "future discovery regarding the underwriting of the Policy," Harper's affidavit does not identify with specificity the facts that such discovery would reveal.  (*See* Kim Decl. ¶ 8).  Accordingly, the Court denies Harper's request to defer consideration on National Union's motion for partial summary judgment. *See Stein*, 906 F.3d at 833 (quoting *Tatum*, 441 F.3d at 1100).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** National Union's motion for partial summary judgment (ECF No. 16).  In particular, the Court grants summary judgment in favor of National Union on Harper's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Further, to the extent that Harper's declaratory relief claim is predicated on National Union's duties to defend or indemnify Harper under the Policy, the Court also grants summary judgment on this claim in favor of National Union.  The Clerk shall not enter judgment because Harper still has several claims pending against National Union.

**IT IS SO ORDERED.**

**DATED: March 28, 2019**

Hon. Cynthia Bashant
United States District Judge